The next case on our calendar is Inouye DAVIS FUND, I think that's all we need to identify the case. Counsel? May it please the court, I am Andrew Robertson on behalf of the plaintiff's appellants. I reserve three minutes of my time for rebuttal. Yes, you have. Proceed. There are disputes of fact with respect to the core issue presented by plaintiff's section 36B claims. Whether the advisory fees charged to the DAVIS NEW YORK VENTURE FUND are within the arm's length range of fees for the DAVIS DEFENDANT'S INVESTMENT ADVISORY SERVICES. Plaintiff's provided evidence of the fees charged to the independent sub-advised funds. Those fees admittedly were negotiated at arm's length and DAVIS admittedly provides substantially the same portfolio management services to the sub-advised funds as it provides to the NEW YORK VENTURE FUND. DAVIS contends that there are differences in other non-portfolio management services, but the district court recognized that those arguments rest on disputed facts. Nevertheless, the district court granted summary judgment based on a comparison to two different funds, the quipper and selected funds, even though defendant's comparison to those funds is rife with factual disputes. The district court... Counsel, this is Judge Brewer. Are you arguing that the question of which funds should be the comparative funds is actually a jury question? It's a question of fact, Your Honor. This is a case that would go to a bench trial, but as recognized in your decision in the O'Hara case, that doesn't mean that the court can't resolve questions of fact. And here, yes, there is a sharply disputed question of fact as to which set of funds established the arm's length range of fees for defendant's investment advisory services. And there's questions of fact particularly with respect to whether the quipper and selected funds provide evidence of that arm's length range. The district court put the burden on plaintiffs to show that the services provided to the quipper and selected funds are different from those provided to the NEW YORK VENTURE FUND. But it was defendants' burden at summary judgment to show that that comparison is apt under Jones. But defendants provided zero evidence regarding the services that Davis actually provides to the quipper and selected funds. The district court's holding that that comparison is apt rests entirely on an assumption, an assumption that the services must be comparable because Davis is the investment advisor for those funds. Was there discovery with respect to that issue? This is Judge Lynch. I'm sorry, Mr. Everton. Was there discovery on the question of what the duties were for these other funds? Defendants didn't put forth any evidence, and plaintiffs, you know, our comparison was with respect to the sub-advised funds. Well, wait, but was there, I mean, I assume, maybe I'm wrong, that there was at least discovery as to what the defendants' contentions were as to what would be comparable funds, right? I mean, you were aware that they were going to rely on these other funds as comparators, weren't you? They did mention them in their interrogatory responses. Right. Excuse me. You presumably filed contention interrogatories asking, so who do you say are the comparators? And they said, apparently, it's these two funds. So there was available discovery with respect to what their duties were at those two funds. Was there such discovery? Did you inquire into that subject? Well, yes, Your Honor, and what we saw was that there are differences in the investment objectives and the investment strategies for the CLPRA and selected funds. So there are arguments as to, I mean, to me it's not a question of who has the burden of proof. I assume that the other side has the burden of proof here with respect to appropriate comparators. But regardless of that, where you said it's the issue of who is a comparator is rife, or whether these two funds are appropriate comparators, are rife with factual disputes. So I'm not asking you about what you proved or what burden of proof you have. I guess I'm just trying to ask, what is it? So they had different strategies, these funds. Is that what makes the duties? Does that raise an issue of fact as to whether the duties that the Davis people performed were different for those funds than for the subject fund? It raises a question of fact both with respect to what Davis does for those funds and what the appropriate fee is for those funds. And could you just explain to me why? I mean, you know, I'm a naive in these financial matters, so I'm not arguing with you. I just would like to know why would a different strategy mean that they have duties that are different in such a way that they should be paid differentially? Well, so the investment objective is the advisor's goal in managing a fund's portfolio. And the strategies are how the advisor goes about pursuing that objective. Right. And these are things that are disclosed right up front in a mutual fund's prospectus. And they impact not only what the advisor does, I mean, what research does it do? What types of analyses does it perform? Right. And is there some evidence in the record that talks about why or something from which you could infer or explain to me why, okay, fund A has this investment strategy, the subject fund has that one, and if you're doing what you're doing for fund A, you don't have to do any work really and shouldn't be paid very much, or you're doing a real lot of work and should be paid more than what's happening in this fund? Just try to spin that out so that it makes sense to me as a fact dispute about why, how much they get paid to be the investment advisor should be different in these two situations. Well, funds, there's a variety of fees that are charged to mutual funds, and one of the critical determining factors of how a fund is, what the fee is, is based on what the fund's investment objective is. If you have a fund that has an international-focused strategy like one of the selected funds here, that generally has a higher price because of a perceived value of investing in international stocks, additional research that's required to invest in international stocks. There also can be differences based on whether the fund is diversified. And these types of factors affect the fee charged by the investment advisor because they affect what the investment results are likely to be for the fund, and they affect what the associated risks are for that fund. So differences in investment strategies and investment objectives absolutely have an impact on what the advisor's fee will be. That's why Ripper, when they do peer comparisons or other groups that do peer comparisons, they tend to classify funds based on their investment objective and their strategies. What type of fund is this? And here, defendants internally in their own reports classified these funds, these corporate-selected funds, separately from the New York Venture Fund, recognizing that these are differences. And it's not just with respect to differences in investment strategies. The defendants also failed to make any showing that the fees charged to the Clipper and selected funds during the period at issue in this case were the result of arm's-length negotiation. Defendants and the district court focused on the initial retention of Davis as the investment advisor for those funds back in 1993 and 2005. But plaintiffs showed that the board members who had initially selected Davis were no longer involved with those funds during the time period relevant to this case, which begins in 2013. The court can't simply infer on summary judgment that new board members continue to negotiate with Davis at arm's length because prior board members did so more than a decade ago. So in view of these disputes of fact, the court's conclusion that the Clipper and selected funds were an uncontroverted apt comparison is clearly incorrect. The district court also went beyond the scope of summary judgment in deciding to give deference to approval of the New York Venture Fund's fees by its board of directors. And like in other cases where courts gave less deference to the board, here the board was given incomplete and misleading information about the services provided to the sub-advised funds. And while the court focuses on the testimony of one of the directors, Marcia Williams, her testimony actually highlights why summary judgment should have been denied. She admitted she'd never seen a sub-advisory agreement, and she admitted she wasn't aware of the extent to which Davis performs non-portfolio management services for the sub-advised funds, like compliance monitoring, board reporting, sales and marketing support, investor education, regulatory filings, shareholder communications, pricing, proxy voting. And Ms. Williams didn't know about those services because Davis never told her about them. Can I just kind of follow that out? I'm just trying to, again, understand exactly what the factual record is. For the sub-advised funds, you're saying there was a possibility of which the board here was not aware that Davis performed the same services or different services? What exactly is it that she wasn't told? Well, what she was told and what she was led to believe is that Davis performed only portfolio management services for the sub-advised funds. But that's inaccurate, you're saying? Absolutely. We have contemporaneous documentary evidence that Davis' service for those funds goes well beyond portfolio management and encompasses a range of non-portfolio management services. And if that's what they do as sub-advisors, what does the actual advisor do to justify getting paid considerably more to be the principal advisor than Davis gets with respect to this fund? Well, that advisor to the sub-advised fund has an additional layer of responsibilities over and above what Davis does. For example, it selects Davis to be the sub-advisor for the fund. It oversees the work that Davis does. But importantly, that doesn't mean that Davis doesn't have to do the work. In fact, it leads to more work because now Davis has to report to an advisor and show up for due diligence meetings and provide information to the advisor about the work that he's doing. Davis still has to do all the underlying tasks. It sounds to me like the people who have a lawsuit are the people investing in that other fund because their advisor is getting paid a whole lot more to do not much other than to complicate the bureaucracy into two levels and make the Davis people do yet more work than they would do if they were the principal advisor. And it just seems to me that what we're talking about here, to maybe get back to the focus of the district court's opinion, is not whether these are exact comparators, any of them, such that the payment should be the same. That's not what is at issue. The question is whether what they're getting paid is outside a reasonable range. What is the basis for that? Why is that in dispute? I thought what the district court said was, yeah, there are a lot of things you could argue back and forth. But at the end of the day, all you're saying is maybe they're getting paid at the top of a reasonable range. Well, Your Honor, the point of view is we have an arm's length range of fees that's established by five different sub-advised funds that we're using as comparators. And Davis is charging the fund 70% more than it charges to those funds for what we contend are substantially the same services. And so our contention, and we believe this raises questions of fact, that when you look at that arm's length range of fees, there is an enormous disparity in the fees charged by Davis relative to that range. And that disparity is not explained or justified in any way by any differences in the services that Davis provides. And we believe that falls right within what Jones wants the courts to be looking at when considering fee comparisons for purposes of Section 36B and determining whether the fees are in line with the arm's length benchmark. Counsel, you have reserved three minutes for rebuttal. We'll hear from the other side. Thank you. May it please the court, my name is Steve Topetsis, and I represent Davis Selected Advisors. The parties are in agreement that the controlling authority is the Supreme Court's decision in Jones v. Harris. The opinion in Jones, which embraces this court's decision in the Gartenberg case years earlier, sets forth the applicable legal standard and describes the essence of the narrow cause of action created pursuant to Section 36B of the Investment Company Act of 1940. Judge Swain, in her opinion, tracks Jones and faithfully applies its holding to the record presented at summary judgment. Section 36B is rooted in fiduciary duty. The Supreme Court in Jones noted that Section 36B embodies a compromise, that it reflects a rejection of a reasonableness standard with respect to mutual fund advisor compensation, and that it does not and is not intended to ensure fee parity. Jones and other Supreme Court precedents also reflect that the cornerstone of efforts to control conflicts relative to mutual funds is scrutiny by an independent board. Thus, as stated by the court in Jones, where a board's process for negotiating and reviewing investment advisor compensation is robust, a reviewing court should afford commensurate deference. If proper factors are considered, the decision of the fund board and its independent directors is entitled to considerable weight, and the standard under Section 36B does not call for judicial second-guessing of informed board decisions. The court in Jones also stated in footnote 8 on page 350 that comparisons with other fees charged to institutional clients, like the insurance company-sponsored funds sub-advised by Davis that form the focus for the plaintiff's appellants, will not doom any fund to trial. The Supreme Court went on to state that only where plaintiffs have shown a large disparity in fees that cannot be explained by the difference in services, in addition to other evidence that the fee is outside the range of arm's-length bargaining, will trial be appropriate. The district court framed its opinion using this structure. The contentions of appellants that Judge Swain drew inferences, weighed evidence, or improperly resolved questions of fact ignore both the language and the substance of the opinion below. I'd like to talk a little bit in response to some of Mr. Robertson's comments and the colloquies with the court concerning some of the evidence and focus on four pieces of evidence beyond the sub-advisor rates cited by appellants with respect to whether the advisory fee paid by the Davis New York Venture Fund is within the arm's-length range. First, and the court noted this, as relates to the five sub-advised funds on which the plaintiffs are focused, the district court noted, and public filings reflect, that the advisory fee paid to the insurance company advisors with respect to each of those funds sub-advised by Davis was higher than the advisory fee charged by Davis to the Davis New York Venture Fund, 85 basis points, 80 basis points, 70 basis points, et cetera, as opposed to the 55 basis point fee charged by Davis to the Davis New York Venture Fund before the first breakpoint. And the reason for those fees is the advisors do a lot more work than the sub-advisors. With respect to my friends on the other side, what Mr. Robertson was outlining for the court in their assertions are distortions, and those characterizations of sub-advisory engagements as encompassing everything and all of the work that's done by advisors are just flat-out false. Every court has rejected those. They've been involved in 10 or so cases, all of which travel on this theory or attempt to travel on this theory. And in every circumstance, those assertions have been rejected. The fact that the sub-advisor is selecting the investments, that's one component, and it's a meaningful component of mutual fund management, but there is so much more that is done to deal with the board, to deal with- The fact that you say that the other side is making arguments that are incompatible with your position, those arguments are based upon matters in the record, and it seems to me that there could be- I'm giving some thought now to whether or not there are reasonable issues of dispute here that should not be decided at summary judgment. Could you address that point? Sure, Judge Walker. It seems to me that the judge may have addressed this as responding to a summary judgment motion, but possibly made findings that were incompatible with that rule. That would be more suited to a bench trial. That would be more suited to a bench trial, in other words. I appreciate the question, Judge Walker, and that's the presentation that the plaintiffs' appellants are trying to make. I think Judge Slane got it right, and was very measured in saying, and she cites this in her opinion, there are divergent perspectives regarding certain issues. There are controverted facts. However, the fact that the range, the arm's length range, includes the fee level charged to the Davis New York Venture Fund, that is uncontroverted. The Supreme Court has said in order to prevail, and a plaintiff has never prevailed in pursuing a claim pursuant to Section 36B in the nearly 50 years since President Nixon signed it into law, near the end of calendar year 1970. In order to prevail, you must show that the fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not be the product of arm's length bargaining. So you can have factual disputes regarding the quality of services, but there's no dispute that this fee was within the arm's length range. It's also true that a number of courts on summary judgment have found no dispute as to the other issues, no genuine dispute. And we submit there's no genuine dispute here, but Judge Slane was very cautious and very thoughtful, and she focused on evidence of the arm's length range, and on that basis determined as a matter of law, coupling that with the deference to be accorded the fund's board, and I wanted to address that. Coupling those things together, the judge determined that as a matter of law, plaintiffs could not prevail and carry their burden here. I want to go back to some of the evidence of the fee level. I talked about the advisory fees charged and paid by the sub-advised fund. The second thing is the selected and clipper funds, as the court discussed with Mr. Robertson. The district court considered evidence regarding the decisions made by the independent boards of directors of those two funds. Those boards approved advisory agreements with Davis to manage mutual funds on fee schedules that are comparable to the fee schedule approved by the board of the Davis New York Venture Fund. Again, and Judge Lynch asked thoughtful questions with respect to whether discovery was taken concerning the services, the services that were available to the plaintiff's appellants. Plaintiffs had a full opportunity. To explore the type or character, the level, the range, the scope of service performed by Davis for those other funds. And I think. Public filings and information that was available to the plaintiff's appellant would show there's a great deal of similarity. There's overlap. The same teams of professionals are performing the services. The red herrings, like whether it's a diversified versus a non-diversified fund, those sorts of things don't really speak to the level of services performed. The character of the services, the range of services, the range of services relative to sub-advised services is more narrow. I understand there may be a factual dispute regarding those things. There is no dispute with respect to the selected fund and the Clipper fund as Judge Swain properly determined. A third category of, of evidence presented to the district court with respect to the fee level relates to peer group data, Lipper data, Lipper a widely recognized independent provider of mutual fund data. Provided peer data relative to fees, expense ratio performance to the mutual fund board here. That data reflected with respect to every year during the relevant period that the advisory fee paid by the Davis, New York venture fund was below the mean and below the median. The fourth category of evidence before the district court related to fee level was an expert report prepared by professor Jonathan Reuter, who examined the relative advisor fee levels and the relative total expense ratio of the fund as against fees charged by a peer group. Among other things, professor Reuter opined that the funds advisory fee was in the bottom 40%. In other words, 60% of the peer funds had higher advisory fees and the funds, total expense ratio was in the lowest 15% of fear of peer father, peer group. In other words, 85% of the peer funds had a higher expense ratio. And all of this. Excuse me. It's your position then that these were that Reuters. Testimony was just stating facts that were. We're not subject to dispute. No, they haven't. Your honor. I apologize. No, your honor. None of that is subject to dispute. All of that is derived from public filing. These are the mutual fund industry is highly regulated, Substantially transparent. The 1940 act overlay and the companion sec regime provide for lots of reporting. There's no dispute with respect to any of those things. They're not only appropriate for consideration at the summary judgment stage. They involve public filings of which the court could even take judicial notice at the initial pleading stage. So none of that is disputed. Yeah. One question I had was why. Your side didn't simply after the evidence was. Was determined. We discovered just seek a bench trial. And, and, or did you, and was it rejected? No, your honor. Section 36 B cases are conducted as bench trials. There's no opportunity for a jury here. No, I understand that, but this wasn't the best trial. This was a motion on summary judgment. In other words, why would you go through this phase of summary judgment when all the facts are out there and the judge is going to be the one to decide the case and just say, let's have a bench trial. Then she can make determinations and you would avoid the argument that she had jumped the gun. And was effectively. Ruling on disputed questions. That's sounds exactly like what I always said to defendants in cases where there was going to be a bench trial about why are you wasting everyone's time with a summary judgment motion? Let's just have a bench file, compile the same record. And then the parties, if they need to cross-examine somebody, or they're going to be credibility issues, tell me what those are. And then make your arguments in the form of a bench trial, which will only take a day or two because most of the evidence is really going to be essentially the same documentary stuff and expert reports and things that are in this summary judgment record. And then I can just draw inferences and you're going to find it easier to win if you have a good case, because instead of having to persuade me that no reasonable knee could decide any other way than what you want, you just have to persuade me that this reasonable knee finds your right by a preponderance of the evidence. It seems to me a much more efficient procedure, but that's not what we've done here. So we're left with. In fact, in fact, on the opinion that the judge made on the expert testimony, she said one of the problems could be corrected by cross-examination, which there wouldn't be if she decided on summary judgment. Right. Just trying in on the same point. Should this question ever arise for council? What judge Lynch just described is what happened is a case that I tried as a district judge involving Merrill Lynch. And it was the advisory fee that was being, or the fee that was being charged for the overnight sweeps in that, in, in by Merrill Lynch and whether it was unreasonable. And we just went right to a bench trial and resolved it that way. But anyway, what's done is done here. So to respond briefly to the court, your honors, we felt there was a basis for summary judgment here. Cases brought pursuant to section 36 B not infrequently are disposed of at summary judgment. Sometimes they're disposed at the initial pleading stage pursuant to emotion under rule 12 V six. That was the case with respect to this court's recent decision in pure and Dini versus JP Morgan, which involved the same theory with respect to a comparison to sub advisor rates, where this court agreed with the district court that there was a failure to state a claim notwithstanding looking holistically at the Gartenberg factors. And I would like opportunity to address those looking holistically at the presumption in favor of the plaintiff in that case as non-moving the plaintiff stated something that might be plausible with respect to some of the Gartenberg factors, but it was deemed by this court not to be enough, even at the motion to dismiss stage, we thought based on this record, there's no genuine dispute. The plaintiffs are manufacturing things quibbles relative to the board process. What judge Swain did here is consistent with Jones. She applied a two-step process. An analysis first, she examined the process of the fund board and its independent directors in reviewing and ultimately approving the subject advisory contract. The district court observed that six of the eight fund directors were unquestionably qualified and independent. She made a similar observation and you can tell from public filings again, with respect to the Clipper fund and the selected fund unquestionably qualified independent that the review of the investment advisory agreement reflected what I'll term, the hallmarks of responsible efficiency process as framed by relevant court decisions, a year round compilation and provision of data engagement by the independent directors of experienced independent 1940 act council with whom the directors consult separately regarding the issues, detailed requests for information and follow on or supplemental requests to which Davis responded by providing a large volume of data, including peer fund data data regarding other advisory clients of data Davis, including the sub advised funds, including the selected fund, including the Clipper fund, um, the manufactured attacks. We termed them in our brief quibbles and as noted by judge Swain, any attack on the independence of the directors who approved this advisory contract is baseless. In fact, in law. The uncontroverted record reflects that it's uncontroverted. The board had the information. You may disagree with the judgment. The Supreme court in Jones makes clear, even if a court might weigh the factors differently, that difference is appropriate. Um, and judge Swain tracking the language from another district court judge with respect to another 36 B, uh, case pursued by opposing council says that a plaintiff should not be able to survive summary judgment through armchair, quarterbacking and captious nitpicking ultimately. And this is contrary to what they allege here on appeal or what they argue on appeal. The district court drew all inferences in favor of the plaintiff and concluded there was no genuine issue as to whether the board was sufficiently the board review was sufficiently robust and that the business judgment of the board is entitled to substantial deference as a matter of law, consistent with Jones. Once that question, the board deference was addressed. The court went on, district court went on to apply Jones and the so disproportionately large test as adopted through Gartenberg. And the court looked at various factors. It looked at comparative fees. It acknowledged in response to the court's questions, factual differences where they exist, um, but focused on whether there was evidence of this fee being in the arm's length range. Now the plaintiff's appellant. Yeah. You're trying to go on as far as in conclusion. Do you want to say anything? Yeah, I would judge just, uh, very quickly. Um, the court, the district court looking at the Gartenberg factors, only two of which were at issue, um, profitability and performance. And again, the numbers there are objective. The district court had the full benefit to evaluate them at the summary judgment stage, the court properly determined that to find liability here would amount to imposing a billing regime. And that's something that is inconsistent with Jones and Gartenberg. Thank you, counsel. Mr. Robertson, you've retained three minutes for rebuttal. Thank you. Um, Judge Walker and Chris, there was a trial, um, as you pointed out, and you noted in your opinion there that you would definitely appraise the testimony of the witnesses in the context of their demeanor, their interest and expertise. The district court didn't do that here because there was no trial. There was no opportunity for the court to assess witness credibility. And that is. Which witnesses credibility would be at issue. Uh, Mr. Robertson, for example, could you give me an example of someone who's, uh, who would be a good witness, a trial on credibility that could affect the outcome? Absolutely. Um, on the question of deference to the board, um, Ms. Williams, the director who testified, um, again, she admitted she wasn't familiar with various aspects of the service. Uh, Davis provides to the subadvisor. Right. But that was all that cross-examination was done. That was all before the district court knew those facts, right? Well, the district court disregarded certain of the testimony we, we provided and focused instead on, on other testimony, um, where, um, and, and explained the way the misleading nature of the information that, um, that Davis provided to the board with respect to subadvised funds, choosing to credit certain testimony and not others that depends very much on the witnesses credibility and seeing the witness. When she says those things, if, if this opinion is allowed to stand, depositions are fact finding, but if this, if this is the process, then plaintiffs have to take every single deposition as, as if that witness is on the stand testifying at trials. Um, and every 36 B case becomes a trial on the papers. Um, there are very clear questions of credibility with respect to what the board knew. And, you know, contrary to Mr. Tepetz's, his characterizations of, of these, um, as quibbles or nitpicking other courts, including the Gallus court in the eighth circuit and the chill versus Calamos decision have recognized that this, the services is charged to independent clients is a very important, important issue for the court, for the board to consider. And if the board isn't appropriately informed on that, that undermines any potential deference that should be given to the board's approval. And one last point, um, there very much were questions of fact about what is the appropriate arm's length range of fees for Davis's investment advisory services. Mr. Tepetz has put out several more examples of potential, um, comparators that could establish that range, but there are questions of fact about which one of those comparators establishes the range. And those questions are particularly important because many of the funds that he's pointing to, including Clipper and selected, including the funds analyzed by Mr. Roeder, including the funds in the whipper peer groups, those are all captive mutual funds. And as this court recognized in Gartenberg, there is a relationship between a mutual fund and its advisor that makes arms length negotiation between those funds, practically impossible. And looking to those funds to establish the arm's length range of fees really eliminates the purpose of section 36B. Thank you, counsel. Thank you both. That concludes our argument calendar. The other cases are on submission. I will ask the clerk to adjourn court. Court is adjourned.